**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

_____   :
                                           :
**SECURITIES AND EXCHANGE**                :
**COMMISSION,**                            :
                                           :   **Civil Action File No.**
           **Plaintiff,**                  :
                                           :   **8:11-cv-02320-JDW-AEP**
**v.**                                     :
                                           :
**JOSEPH P. CILLO,**                       :
           **Defendant.**                  :
                                           :
_____   :

**BRIEF IN SUPPORT OF SEC'S DISPOSITIVE MOTION FOR
SUMMARY JUDGMENT AGAINST DEFENDANT CILLO, WITH STATEMENT
OF MATERIAL FACTS TO WHICH THERE IS NO GENUINE DISPUTE**

**I.     Introduction**

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") files this brief

in support of its dispositive motion for summary judgment against Defendant Joseph P. Cillo.[1]

Its motion is based upon the uncontroverted facts that: (a) Cillo has been barred since June 1995

by a valid order of the SEC from "participating in an offering of any penny stock;" (b) Cillo

acquired a shell corporation and assumed the roles of CEO and majority shareholder of eFUEL

EFN Corp. ("eFUEL") after acquiring millions of shares of that company's stock; (c) eFUEL

was, at all relevant times, a penny stock company; (d) Cillo engaged in conduct which violated

the penny stock bar by signing issuance resolutions for eFUEL stock, by taking part in the

---

[1] This motion is supported by the herein included _Statement of Material Facts To Which There Is No Genuine Dispute_ (hereinafter "Facts, ¶__") which is based on the pleadings in this case, the sworn testimony of Cillo taken on 8/11/2011 (during the course of the SEC's investigation), various exhibits to that sworn testimony, Cillo's Responses to the SEC's First Request For Admissions and the Declaration of Nana Jorjoladze. The supporting documents (except for pleadings which are in the record) are filed with and incorporated into this brief. The SEC refers to all "Facts" by their internal numbering system of ¶1-27 as set forth initially with record citations in the Facts section below.

preparation and issuance of multiple eFUEL press releases and by providing, on eFUEL's behalf, periodic reports and other information to the OTC Markets Group concerning the public penny stock company; and (e) Cillo sold his interests in the penny stock of eFUEL earning at least $20,000, which should be disgorged as profits earned in violation of the penny stock bar, together with prejudgment interest thereon. In addition to disgorgement and prejudgment interest thereon, the SEC seeks permanent injunctive relief and an order against Cillo directing his future compliance with the penny stock bar ordered by the agency, a statutory penny stock bar against Cillo and a civil penalty from Cillo.

## II.    Statement of Material Facts To Which There is No Genuine Dispute

### A.  Relevant Personal Information And Background of Joseph P. Cillo

1.  Cillo is a resident of Dade City, FL. [Answer of Cillo, ¶13; Sworn Test. of Cillo, 10/7-8].

2.  Cillo went to law school at California Western School of Law in San Diego, and later became a member of The Florida Bar.  [Sworn Test. of Cillo, p. 11/3-13].

3.  On or about March 18, 1993, the Florida Supreme Court issued an Order in The Florida Bar v. Joseph P. Cillo, 617 So. 2d 321 (Fla. 1993) granting Cillo's uncontested petition to resign from The Florida Bar, in lieu of disciplinary proceedings.  [Sworn Test. of Cillo, pp. 24/6-25/4; Ex. 6 to Cillo Testimony (Florida Supreme Court Ruling on Cillo bar membership)].  Exhibit 6 is a true and correct copy of the Florida Supreme Court's Order dated March 18, 1993.  [See Cillo's Response to SEC's First Request for Admissions #3].

### B.  The SEC's Prior Enforcement Litigation Against Cillo, As The Defendant Or Respondent, And The Imposition of A Penny Stock Bar Against Him

4.  The Commission filed a civil injunctive action against Cillo on March 11, 1991 in SEC v. Sterns, et al., No. 2:91-cv-01303-ER (C.D. Cal.).  In its complaint, the Commission alleged,

among other things, that from approximately January 1986 through March 1989, Cillo, together with others named in the complaint, engaged in a fraudulent scheme to unlawfully distribute the unregistered securities of seven dormant shell corporations. [Answer of Cillo, ¶14]. A final judgment of permanent injunction was entered against Cillo and others in this case during 1991. [Sworn Test. of Cillo, pp. 11/17-13/20; Ex. 3 to Cillo Testimony (6/12/1991 Lit. Release of SEC)].

5. The Commission filed another civil injunctive action against Cillo on September 28, 1993 in SEC v. Unifirst Corporation, et al., No. 93-C-867J (D. Utah). The complaint alleged in relevant part that Cillo, as corporate counsel for a privately held company, had aided and abetted the company's president in a scheme to acquire an undisclosed interest in the stock through an unregistered offering. [Answer of Cillo, ¶16]. On January 3, 1994, Judge Bruce S. Jenkins of the U.S. District Court for the D. of Utah issued an order of permanent injunction against Cillo enjoining him from aiding and abetting further violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act And Rule 10b-5 promulgated thereunder. [See Ex. 4 to Cillo Testimony, pg. 3, (Order of Commission Making Findings And Imposing Remedial Sanctions dated 6/13/1995)].

6. On or about June 13, 1995, the Securities and Exchange Commission entered an Order Making Findings and Imposing Remedial Sanctions against Cillo in In the Matter of Ray S. Stoddard and Joseph P. Cillo in Administrative Proceeding File No. 3-8670, which specifically barred Cillo from participating in an offering of any penny stock. [Sworn Test. of Cillo, pp. 14/1-15/13; Ex. 4 to Cillo Testimony (Commission Order Against Cillo)]. Exhibit 4 is a true and correct copy of the Commission's Order barring Cillo. [See Cillo's Response to SEC's First Request for Admissions #1]. Cillo fully acknowledges that this Order barred him "from

participating in an offering of any penny stock." [See Cillo's Response to SEC's First Request for Admissions #12].

7.  Earlier, on or about May 15, 1995, Cillo had consented to the entry of the Commission's order specifically barring him from participating in an offering of any penny stock.  [Ex. 5 to Cillo's Sworn Testimony (Signed Offer of Settlement In the Matter of Joseph P. Cillo)].  Under oath, Cillo at first acknowledged that the signature on this document "could very well be my signature," but after a conference with his counsel during the context of the sworn testimony stated that the signature in question "does not appear to be my signature."  [Sworn Test. of Cillo, pp. 15/17-16/6].  Later in the same testimony, Cillo explained that while he had "no recollection of that being my signature," he "very well could have signed it." [Sworn Test. of Cillo, p. 17/6-17].  Cillo further acknowledged that he did in fact *offer to settle* with the Commission in his case before the Commission, and that he had no reason to believe that someone had forged his signature, or that the document was otherwise fabricated.  [Sworn Test. of Cillo, p. 18/1-21].

8.  Cillo entered into the settlement with the Commission on the penny stock bar at a time after he had become a practicing attorney, and was himself knowledgeable about the federal securities laws.  [Sworn Test. of Cillo, p. 20/11-21/18].

**C.  Cillo Assumes Roles of CEO and Majority Shareholder of eFUEL**

9.  In November 2007, through a reverse merger with a penny-stock shell company, Defendant Cillo became the CEO and controlling shareholder of eFUEL EFN Corp. ("eFUEL"), a purported web development company then based in Tampa, Florida and listed on the OTC Market Group's "OTC Pink" market tier (formerly the "Pink Sheets") under the symbol "EFUL."  [Answer of Joseph P. Cillo, ¶2].

10. Specifically, in November 2007, through a reverse merger between EFUEL Network, Inc., a Florida corporation controlled by Cillo, and Preservations Sciences, Inc. ("Preservation Sciences"), a penny-stock shell company, Cillo installed himself as the CEO and controlling shareholder of Preservation Sciences's renamed successor entity, eFUEL, a purported web development company based in Tampa, Florida and listed it on the Pink Sheets. [Answer of Cillo, ¶20; Sworn Test. of Cillo, pp. 29/2-33/18].

11. eFUEL had a handful of employees (with responsibilities ranging from information technology to accounting), several of whom doubled as officers and directors of the company. [Answer of Cillo, ¶21].

12. A stock exchange agreement between eFUEL and Cillo evidencing that transaction was executed and signed by Cillo. [Sworn Test. of Cillo, pp. 29/2-36/4; Ex. 7 to Cillo Testimony (Stock Exchange Agreement between eFUEL and Cillo; Cillo signature on pg. CILLO_00049)]. Cillo paid nothing to obtain control of Preservation Science, and thereafter changed the name of the company to eFUEL. [Sworn Test. of Cillo, p. 35/16-23].

### D. Cillo's Conduct Involving Issuance of eFUEL Stock, Issuance of eFUEL Press Releases, and The Submission of Periodic Disclosure Statements To The OTC Markets Group

13. As CEO, Cillo signed at least 80 "issuance resolutions" collectively authorizing eFUEL's transfer agent to increase eFUEL's outstanding shares by hundreds of millions of shares, and instructing the transfer agent to issue those shares to various third parties. [Answer of Cillo, ¶25; Sworn Test. of Cillo, pp. 38/10-43/22; Ex. 9 to Cillo Testimony (Issuance Resolutions Signed by Cillo, Directing Issuance of eFUEL Shares of Stock)]. These issuances by Cillo were made as payment for services (e.g., setting up a company website) or related debts. [Answer of Cillo, ¶26; Sworn Test. of Cillo, pp. 38/10-43/22, 48/3-49/22]. Exhibit 9 is a true and correct

copy of the Issuance Resolutions for common stock in eFUEL during the relevant period, which Cillo produced to the SEC. [See Cillo's Response to SEC's First Request for Admissions #5, #16]. Cillo fully acknowledges that he caused these issuance resolutions to be signed and issued to satisfy debts owed to them by eFUEL; to raise funds for eFUEL for its "new activities;" and so that eFUEL had funds for corporate expansion. [See Cillo's Response to SEC's First Request for Admissions #17, 19, 21 and 23].

14. During the relevant period, eFUEL issued at least 50 press releases touting the company's business plan, development prospects, and growth potential. [Answer of Cillo, ¶29; Sworn Test. of Cillo, pp. 96/1-106/24; Exhibit 19 to Cillo Test. (Compilation of eFUEL Press Releases)].

15. In his positions at eFUEL, Cillo drafted and approved multiple press releases touting the company's business plan and development prospects (which included Investor Relations contact information). [Answer of Cillo, ¶4].

16. Various press releases including claims that the company had developed a "Background Checker app" available on iTunes, had expanded its reach into "the $400 billion government market sector," and had entered into marketing agreements to broadcast 30-second commercials. [Answer of Cillo, ¶30; Sworn Test. of Cillo, pp. 96/1-106/24; Ex. 19 to Cillo Testimony (Compilation of eFUEL Press Releases)].

17. Cillo personally reviewed and drafted some of eFUEL's press releases, which were posted on eFUEL's website and distributed via newswire. [Answer of Cillo, ¶31; Sworn Test. of Cillo, pp. 96/1-106/24; Ex. 19 to Cillo Testimony (Compilation of eFUEL Press Releases)].

18. During the relevant period, eFUEL filed periodic reports with the OTC Markets Group in order to comply with the Pink Sheets' minimal requirements for "adequate current information."

[Answer of Cillo, ¶32; Sworn Test. of Cillo, pp. 72/11-78/25; Exs. 16 and 17 to Cillo Test. (eFUEL's Pink Sheets Submissions)].

19. Companies listed on the Pink Sheets are categorized into three tiers based on the amount and timeliness of their financial disclosures. By submitting periodic reports containing financial and related information, Pink Sheet companies can avoid the Pink Sheets' "No Information" tier and the "STOP" designation discouraging trading in their stock. [Answer of Cillo, ¶33; Sworn Test. of Cillo, pp. 72/11-78/25; Exs. 16 and 17 to Cillo Test. (eFUEL's Pink Sheets Submissions)].

20. Cillo signed and assisted in the preparation of these reports, and he understood that "it was necessary to provide" such reports to the Pink Sheets. Cillo helped to prepare the documents. [Answer of Cillo, ¶34; Sworn Test. of Cillo, pp. 72/11-78/25; Exs. 16 and 17 to Cillo Test. (eFUEL's Pink Sheets Submissions)].

21. In his positions at eFUEL, Cillo prepared, signed and submitted periodic reports to the OTC Markets Group in order to comply with the Pink Sheets' minimal requirements for "adequate current information." [Answer of Cillo, ¶4].

### E. Cillo Sells His Stock In eFUEL

22. On or about January 19, 2011, Cillo agreed to sell a controlling interest in eFUEL to Euro-American Finance Network Inc. ("EAFN"), a transaction which apparently closed in or around March 2011. [Answer of Cillo, ¶35; Sworn Test. of Cillo, pp. 32/3-33/18]. Cillo owned at least 250 million shares of eFUEL, which gave him voting power to control the company. [Sworn Test. of Cillo, p. 33/1-18].

23. Cillo received at least $20,000 for his shares in that sale to EAFN. [Sworn Test. of Cillo, pp. 60/19-61/13].

24. As of April 8, 2011, eFUEL changed addresses, removed officers and directors (including Cillo), and replaced those officers and directors with persons associated with EAFN. [Answer of Cillo, ¶37].

## F. eFUEL Was A Penny Stock

25. At all relevant times, eFUEL's common stock qualified as a penny stock because it was an equity security that did not meet any of the exceptions from the definition of penny stock contained in Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder. [Answer of Cillo, ¶39]. Between November 2007 and January 2011, when Cillo was the CEO and controlling shareholder of eFUEL, the company was a "penny stock" company. [Answer of Cillo, ¶13]. Moreover, during the relevant period, eFUEL's shares never traded above $1 per share. [Answer of Cillo, ¶22].

26. Among other things, eFUEL's common stock, quoted on the Pink Sheets, did not trade above a dollar per share during the relevant period and was not (1) registered on a national securities exchange or authorized for quotation on NASDAQ; (2) was not an NMS stock as defined in 17 CFR § 242.600(b)(47); and, (3) was not issued by a registered investment company. In addition, eFUEL had virtually no demonstrable assets or revenue for at least the last three years. [Answer of Cillo, ¶40; Sworn Test. of Cillo, pp. 67/8-71/19; Ex. 15 thereto, (eFUEL Unaudited Statements of Financial Position as of 12/31/2009 and 12/31/2010)].

27. In its unaudited financial statement for the period ending 12/31/2009, eFUEL listed its then total current assets at $7; and for the period ending 12/31/2010, eFUEL listed its then assets at $0. [Sworn Test. of Cillo, pp. 68/2-71/19; Ex. 15 thereto; See Cillo's Response to SEC's First Request for Admissions #26].

### III.    Summary Judgment is Appropriate In This Case

Rule 56(c) of the Fed. R. Civ. P. provides that a party is entitled to summary judgment "if there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."[2]  Even factually complex cases brought by the SEC may be disposed of by summary judgment.[3]  Accordingly, in suits for injunctive relief, district courts should not hesitate to grant a plaintiff's request for summary judgment when the defendant has failed to meet the requirements prescribed by Rule 56(e).  This principle is not diluted simply because the Commission is the moving party.[4]

### The Relevant Penny Stock Prohibitions

Section 15(b)(6)(A)(iii) of the Exchange Act authorizes the SEC to prohibit persons from participating in an offering of penny stock.  Section 15(b)(6)(C) of the statute defines "person participating in an offering of penny stock" to include among other things any person "who engages in activities with a[n] issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock."  On June 13, 1995, the Commission entered an order that "barred [Cillo] from participating in an offering of any penny stock."  In the Matter of Joseph P. Cillo, Admin. Proc. File No. 3-8670 (June 13, 1995); [Facts ¶6].

### eFUEL Shares Were A Penny Stock

---

[2]    Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986); Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991); see also Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997); Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 743 (11th Cir. 1996); Hammer v. Slater, 20 F.3d 1137, 1140 (11th Cir. 1994); Campbell v. Washington County Technical Coll., 219 F.3d 3, 5 (1st Cir. 2000).

[3]    See SEC v Spence & Green Chem. Co., 612 F.2d 896 (5th Cir. 1980), cert. denied, 449 U.S. 1082 (1981); see also SEC v. Murphy, 626 F.2d 633 (9th Cir. 1980); SEC v. Balvin, 557 F. Supp 1304 (S.D. Mich. 1983) aff'd, 760 F.2d 706 (6th Cir. 1985); SEC v. Stanwood Oil Corp., 516 F. Supp. 1181 (W.D. Pa. 1981).

[4]    SEC v. Research Automation Corp., 585 F. 2d. 31, 33-34 (2d Cir. 1978); see also Spence & Green Chem. Co., 612 F.2d 896.

At all relevant times, eFUEL's common stock qualified as a penny stock because it was an equity security that did not meet any of the exceptions from the definition of penny stock contained in Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder.  [Facts, ¶25]. Among other things, eFUEL's common stock, quoted on the Pink Sheets, did not trade above a dollar per share during the relevant period and was not (1) registered on a national securities exchange or authorized for quotation on NASDAQ; (2) was not an NMS stock as defined in 17 CFR § 242.600(b)(47); and, (3) was not issued by a registered investment company.  [Facts, ¶26].  In addition, eFUEL had virtually no demonstrable assets or revenue for at least the last three years.  [Facts, ¶26-27].  The undisputed facts in this case further establish that eFUEL was at all times a penny stock.  Cillo has fully admitted throughout his Answer in this case that eFUEL's common stock was a penny stock. [Facts, ¶25-27].  He has also consistently admitted the same in his sworn testimony given before the SEC on 8/11/2011.  It is undisputed that eFUEL was a penny stock at all relevant times.

## The SEC's Prior Litigation Against Cillo, and Related Penny Stock Bar

More than twenty (20) years ago, the Commission filed a civil injunctive action against Cillo (on 3/11/1991) in SEC v. Sterns, et al., No. 2:91-cv-01303-ER (C.D. Cal.).  [Facts, ¶4].  In its complaint, the SEC alleged, among other things, that from January 1986 through March 1989, Cillo, together with others named in the complaint, engaged in a fraudulent scheme to unlawfully distribute the unregistered securities of seven dormant shell corporations.   [Facts, ¶4].  Without admitting or denying the allegations of the SEC's complaint, Cillo and others consented to the entry of Final Judgments of Permanent Injunction enjoining them variously from further violations, or aiding and abetting violations, of §§ 5 and 17(a) of the Securities Act, §§ 10(b) and 15(a) of the Exchange Act, and Rule 10b-5. [Cillo Sworn Test. pp. 11-13].

The SEC filed a civil injunctive action against Cillo on 9/28/1993 in <u>SEC v. Unifirst</u> <u>Corporation, et al.</u>, No. 93-C-867J (D. Utah). The complaint alleged in relevant part that Cillo, as corporate counsel for a privately held company, had aided and abetting the company's president in a scheme to acquire an undisclosed interest in the stock through an unregistered offering.[5] [Facts, ¶5]. On January 3, 1994, the U.S. Dist. Court for the D. of Utah permanently enjoined Cillo from future violations of § 17(a) of the Securities Act of 1933 ("Securities Act") and §10(b) of the Exchange Act and Rule 10b-5. [Facts, ¶5].

On 4/17/1995, the SEC instituted administrative proceedings based on the entry of the permanent injunction in <u>Unifirst</u>. After it instituted these proceedings, Cillo submitted an Offer of Settlement which the SEC determined to accept. Specifically, Cillo agreed to be and was "barred from participating in an offering of any penny stock."[6] [Facts, ¶6-8]. As Cillo had been a practicing attorney in Florida, at the time he entered into the settlement and agreed to be barred from participating in a penny stock offering, Cillo was knowledgeable about federal securities laws and clearly understood the scope of the conduct he could not undertake. [Facts, ¶ 8].

**Relevant Background on eFUEL**

In November 2007, through a reverse merger between eFUEL, a Florida corporation controlled by Cillo, and Preservation Sciences, a penny-stock shell company, Cillo installed himself as the CEO and controlling shareholder of Preservation Sciences's renamed successor entity, eFUEL. eFUEL was a purported web development company based in Tampa, Florida and listed on the Pink Sheets. [Facts, ¶9-10]. According to Cillo's testimony and reports filed by

---

[5]      An attorney who went to law school at California Western School of Law in San Diego, and one who was formerly licensed and practicing in Florida, Cillo resigned from the Florida bar in 1993 in lieu of disciplinary proceedings. [Facts, ¶2-3].

[6]      <u>In the Matter of Ray S. Stoddard and Joseph P. Cillo</u>, Admin. Proc. File No. 3-8670 (June 13, 1995).

eFUEL with the OTC Market Group, eFUEL had a handful of employees (with responsibilities ranging from information technology to accounting), several of whom doubled as officers and directors of the company. [Facts, ¶11]. A stock exchange agreement between eFUEL and Cillo evidencing that transaction was executed and signed by Cillo. [Facts, ¶12]. Cillo paid nothing to obtain control of Preservation Science, and thereafter simply changed the name of the company to eFUEL. [Facts, ¶12].

During the relevant period, eFUEL's shares never traded above $1.00 per share. [Facts, ¶25-26]. Nor did the company have net tangible assets of 2,000,000 or more, or have average revenues over $6,000,000 for any three-year period. According to Cillo's testimony and the unaudited financial reports that eFUEL filed with the OTC Market Group, the company generated no revenues in 2009 or 2010. [Facts, ¶26-27]. In fact, eFUEL finished 2009 with $7 of net assets, and finished 2010 with no net assets. [Facts, ¶27].

### As CEO of eFUEL, Cillo Engaged In Activities Related To, And For The Purpose of, Issuing, Trading, And Inducing the Purchase of the Company's Shares

From December 2007 to December 2010, Cillo engaged in various activities directly related to issuing, trading, and inducing the purchase of eFUEL stock:

**Issuance of eFUEL stock**: As CEO, Cillo signed at least 80 "issuance resolutions" collectively authorizing eFUEL's transfer agent to increase eFUEL's outstanding shares by hundreds of millions of shares, and instructing the transfer agent to issue those shares to various third parties. [Facts, ¶13]. Cillo testified that these issuances were made as payment for services (e.g., setting up a company website) or related debts. [Facts, ¶ 13]. Cillo cannot deny that the issuance resolutions, which included both restricted and free trading stock, were approved and

signed by Cillo "[i]n lieu of a meeting of the board of directors[.]"  [Facts, ¶13; Exhibit 9 to Cillo

Testimony—the Issuance Resolutions signed by Cillo, and produced by him to the SEC].

Moreover, on the face of the approximately 80 issuance resolutions that Cillo produced to

the SEC, it is obvious that this conduct amounts to a direction by Cillo to the transfer agent to

issue millions of shares of both free trading and restricted stock in the penny company to

multiple recipients.  But for Cillo's conduct directing these numerous stock transfers, there

would have been no practical and meaningful way to disperse eFUEL's penny stock to the

intended recipients.   Clearly, by a cursory review of the stock issuance resolutions in Ex. 9,

Cillo was very effective during the relevant period in distributing eFUEL's shares.  This is

precisely the conduct that Cillo's penny stock bar is designed to prohibit.

It is expected that Cillo will argue, that he signed the stock issuance resolutions "only as

CEO" and that his conduct was somehow not subject to the penny stock bar because he did not

issue the resolutions in his individual or personal capacity.  Cillo's attempt to "split hairs" on this

point—is patently absurd.  Such a reading is not supported by any case law with which the SEC

is familiar.  More importantly, such a restrictive interpretation of the penny stock bar (which is

conceptually defined by the statute itself to broadly cover a large range of the anticipated

conduct of those properly barred) would have the effect of gutting penny stock bars issued by the

Commission.  As the SEC is the agency charged with protecting the securities markets from

violators of the federal securities laws, any ruling that diminishes or guts the ability of the SEC

to impose penny stock bars and to enforce those bars imposed on recidivist securities violators

such as Cillo, would be meaningless, and would be contrary to the broadly worded statute.  Cillo

was properly barred from taking part in an offering of any penny stock.  That includes barring

the conduct of one "who engages in activities with a[n] issuer for purposes of the issuance or

trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock." Whether Cillo signed the stock issuance resolutions "as CEO only" or in his personal capacity is irrelevant. Cillo has plainly violated the penny stock bar issued by the SEC.

**Drafting and approving eFUEL press releases**: During the relevant period, eFUEL issued at least 50 press releases touting the company's business plan, development prospects, and growth potential. [Facts, ¶14-15]. Various press releases included claims that the company had developed a "BackgroundChecker app" available on iTunes, had expanded its reach into "the $400 billion government market sector," and had entered into marketing agreements to broadcast 30-second commercials. [Facts, ¶16. Cillo testified that he personally reviewed and drafted some of eFUEL's press releases, which were posted on eFUEL's website and distributed via newswire. [Facts, ¶17]. Other press releases were prepared and posted, without his review, by an individual working as "investor relations," (Cillo Test., pp. 98-102) yet they were all issued on Cillo's watch as CEO and majority shareholder.

Like the stock issuance resolutions that Cillo produced to the SEC, he also produced the 50 plus eFUEL press releases that make up Ex. 19. From a review of the press releases, it is apparent that many of them have been issued to bolster or generate interest *in eFUEL's common stock*. For example: **1)** on 4/21/2009, eFUEL issued a press release announcing a stock buy-back program for eFUEL [Ex. 19, pp. Cillo_00281]; **2)** on 5/6/2009, eFUEL issued a press release announcing updates to shareholders eFUEL stock buy-back and stock retirement of 25 million shares [Ex. 19, pp. Cillo_00279]; **3)** on 6/12/2009, eFUEL issued a press release relating to a reverse split of eFUEL stock [Ex. 19, pp. Cillo_00278; **4)** on 6/12/2009, eFUEL issued a separate press release announcing a 40 to 1 reverse split of eFUEL stock [Ex. 19, pp. Cillo_00277]; **5)** on 6/10/2010, eFUEL issued a press release announcing intentions to withdraw

its previous "filing" dated 6/2/2010 for a reverse stock split [Ex. 19, pp. Cillo_00236]; **6)** on 6/11/2010, eFUEL issued a press release announcing unanimous vote of eFUEL Board of Directors to not execute the proposed reverse merger of eFUEL common shares [Ex. 19, pp. Cillo_00235]; **7)** on 10/1/2010, eFUEL issued a press release announcing that eFUEL had reached an agreement with EAFN "to assist in identifying and financing potential business opportunities and acquisitions," and that EAFN then owned 65 million shares of eFUEL and had options to acquire 250 million additional shares through stock options starting at .001 for 9 months [Ex.19, pp. Cillo_00225]; **8)** on 10/6/2010, eFUEL issued a press release announcing it then had 750 million shares of authorized common stock, and that EAFN then owned 85 million shares of eFUEL stock [Ex. 19, pp. Cillo_00224]; and **9)** on 10/19/2010, eFUEL issued a press release announcing that eFUEL then had 750 million shares of authorized common stock and that EAFN by that time owned in excess of 100 million shares of the stock purchased at arms-length transactions [Ex. 19, pp. Cillo_00223].

In simply reading through these press releases, it is without dispute that they were issued under Cillo's watch, control and supervision and were designed and issued to affect the stock price of eFUEL. Cillo clearly saw it important enough to keep eFUEL's penny stock buying public advised of reverse stock splits, and to later to keep the same public fully versed as EAFN became a progressively larger owner of eFUEL's common stock. Without factual or legal doubt, Cillo used the press releases of eFUEL to communicate with the public who would buy eFUEL's stock, and used press releases of eFUEL to stir up interest in a market for eFUEL's penny stock.

**Submission of periodic disclosure statements to the OTC Markets Group**: During the relevant period, eFUEL filed periodic reports with the OTC Markets Group in order to comply with the Pink Sheets's minimal requirements for "adequate current information." [Facts,

¶18]. Companies listed on the Pink Sheets are categorized into three tiers based on the amount and timeliness of their financial disclosures. [Facts, ¶19]. By submitting periodic reports containing financial and related information, Pink Sheet companies can avoid the Pink Sheets' "No Information" tier and the "STOP" designation discouraging trading in their stock. [Facts, ¶19]. Cillo signed and assisted in the preparation of these reports. [Facts, ¶20-21]. He testified that he understood that "it was necessary to provide" such reports to the Pink Sheets, and that he helped to prepare the documents. [Facts, ¶20-21].

### Cillo Violated His Penny Stock Bar

Cillo violated his penny-stock bar because he engaged in activities with eFUEL for purposes of issuing, trading, and inducing others to purchase eFUEL's penny stock.[7] As set forth above, Cillo issued and/or offered hundreds of millions of shares of eFUEL stock to third-parties, drafted and approved multiple press releases touting the company's business plan and development prospects, and prepared, signed, and submitted periodic disclosure statements to the OTC Markets Group. Each of these acts constituted an activity with eFUEL done for the purpose of issuing, trading and inducing others to purchase eFUEL's stock. This conduct is precisely the conduct that is prohibited by the SEC's penny stock bar against Cillo that had been in place since 1995.

### Cillo Sells eFUEL and Resigns From Its Board of Directors

On or about 1/19/2011, Cillo agreed to sell a controlling interest in eFUEL to EAFN, a

---

[7]     See Exchange Act, § 15(b)(6)(C) (defining "participating in an offering of penny stock" to include someone who "engages in activities with a[n] issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock").

transaction which apparently closed in March 2011.[8]   [Facts, ¶22].   Cillo testified that he

received at least $20,000 for his shares [Facts, ¶23].   As of 4/8/2011, eFUEL has changed

addresses, removed officers and directors (including Cillo), and replaced those officers and

directors with persons associated with EAFN. [Facts, ¶24].

## IV.   REMEDIES

### This Court Should Permanently Enjoin Cillo And Enter An Order Commanding Him To Comply With The Commission's Penny Stock Bar

Pursuant to § 21(e) of the Securities Exchange Act of 1934 "Exchange Act"  [15 U.S.C. §

78u(e)],  this Court has the authority to grant plaintiff's request for a court order commanding

Cillo to comply with the SEC's prior penny stock bar.  Under § 21(d)(1) of the Exchange Act,

the SEC is also entitled to charge and prove Cillo's violations of his penny stock bar as a

substantive violation of the federal securities laws.  Specifically, under §15(b)(6)(B)(i) of the

Exchange Act, it is unlawful for a person subject to a penny stock bar to violate such a bar.

Pursuant to §§ 21(d)(1) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(e)], the

SEC herein seeks a court order imposing a statutory penny stock bar pursuant to § 21(d)(6), and

it also seeks a permanent injunction against Cillo for future violations of §15(b)(6)(B)(i).[9]

Sections 21(d) and 21(e) state that the U. S. District Courts "shall" upon "proper

---

[8]         The purchaser of eFUEL was not surprisingly EAFN, the same entity that Cillo referred to in the string of eFUEL's press releases outlined above, as the entity that had then been acquiring progressively larger stakes in eFUEL's common stock.

[9]         While Cillo may somehow contend that the SEC has unfairly singled him out to enforce the agency's bar imposed on his penny stock conduct, there is substantial authority that the Commission regularly seeks to enforce the bars that it imposes on securities laws violators.  By way of illustration, the Commission has previously authorized civil injunctive actions pursuant to Section 21(d)(1) seeking disgorgement and civil penalties for violations of Section 15(b)(6)(B) based on failure to comply with penny stock and associational bars .  See Lit. Release No. 20734, Sept. 22, 2008, SEC v. Wade, No. 2:08cv209-KS-MTP (S.D. Miss.) (penny stock bar); Lit. Release No. 20714, Sept. 12, 2008, SEC v. Kerschenbaum, No. 08-61452-CIV (S.D. Fla.) (penny stock bar); Lit. Release No. 18289, Aug. 14, 2003, SEC v. Kotrozo, et al., No. CV 03-5781 FMC (C.D. Cal.) (associational bar); Lit. Release No. 17532, May 23, 2002, SEC .v Martino, et al., May 23, 2002, No. 98 Civ. 3446 (S.D.N.Y.) (associational bar).

showing" grant a permanent injunction against any person who is engaged or is about to engage

in any acts or practices that establish a violation of the federal securities laws.[10]  The SEC is

entitled to injunctive relief if it establishes past violations that indicate a reasonable likelihood

that the wrong will be repeated.[11]  The existence of past violations permits an inference that

future violations will occur, and the fact that the defendant presently complies with the securities

laws does not preclude an injunction.[12]

    In analyzing the need for injunctive relief, courts focus on whether there is a reasonable

likelihood that the defendant, if not enjoined, will engage in future illegal conduct. In granting or

denying injunctive relief, courts have considered, inter alia, the egregiousness of the violations,

the isolated or repeated nature of the violations, the degree of scienter involved, the likelihood

that the defendant's occupation will present opportunities (or lack thereof) for future violations,

and the defendant's age and health.[13]

    Consideration of these factors supports the entry of a permanent injunction against Cillo,

based on violations of § 15(b)(6)(B)(i) of the Exchange Act.  Cillo has demonstrated a brazen

willingness to posture himself as the CEO and the initial sole shareholder of a penny stock

company.  Cillo is trained in the law.  During his tenure as an attorney admitted in Florida, he

engaged in a securities based practice and conduct—as evidenced by the history of securities

litigation brought against him by the Commission going back to the 1980s and 1990s.  Cillo was

effectively disbarred in Florida—having resigned from the Florida Bar in 1993 in lieu of

---

[10]    See SEC v. Mize, 615 F.2d 1046 (5th Cir. 1980).

[11]    SEC v. First Fin. Group of Texas, 645 F.2d 429, 434 (5th Cir. 1981); SEC v. Blatt, 583 F.2d 1325, 1334 (5th Cir. 1978).

[12]    See SEC v. Koracorp Indus., Inc., 575 F.2d 692, 699 (9th Cir. 1978); SEC v. Commonwealth Chem. Secs., 574 F.2d 90, 99-100 (2d Cir. 1978).

[13]    See, e.g., SEC v. Bonastia, 614 F.2d 908 (3rd Cir. 1980); SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90, 100-101 (2d Cir. 1978).

disciplinary proceedings. For Cillo to suggest that he never fully read the penny stock bar issued against him, or to suggest that he never understood the scope of the conduct which the bar prohibited him from engaging in, is simply preposterous. Cillo clearly facilitated the transfer of millions of shares of eFUEL stock from late 2007 through late 2010, shortly before he sold eFUEL. Each of the approximate eighty (80) times that Cillo signed a stock issuance resolution directing the transfer agent to issue shares to third parties, he violated the penny stock bar against him. Over the more than three year period at issue, he effectively transferred millions of shares of eFUEL's penny stock to others. But for Cillo's actions, the penny stock of that company could not have been disseminated to third parties between late 2007 and late 2010.

Further, eFUEL issued press releases more than fifty (50) times while the company was under the control of Cillo as its CEO. The effect of those press releases by a then valueless company could only have been for the sole purpose of generating interest in the stock value of the penny stock company. Of the known press releases issued by eFUEL in the relevant period, approximately 20% of them directly "talked-up" interest in the stock itself. The other press releases talked about business dealings anticipated by eFUEL which did not come fully to fruition during the relevant period—and so were less directly related to stirring up interest in the stock. However, those as well attempted to make the penny stock company appear more developed than it really was, that eFUEL had a brighter future than it actually had, that it had or would have revenue when eFUEL otherwise reported that it had none, and generally that the company had value when other filings showed that was not the case. To various extents, the issuance of each of the press releases constituted a violation by Cillo of the SEC's penny stock bar against him.

During the relevant period, Cillo also signed and assisted in the preparation of eFUEL's filed periodic reports with the OTC Markets Group in order to comply with the Pink Sheets' minimal requirements for "adequate current information." The securities savvy Cillo clearly knew and understood that companies listed on the Pink Sheets are categorized into three tiers based on the amount and timeliness of their financial disclosures. By submitting periodic reports containing financial and related information, Pink Sheet companies can avoid the Pink Sheets' "No Information" tier and the "STOP" designation discouraging trading in their stock. With this uncontroverted knowledge at his disposal, Cillo undertook activities that had the effect of and was for the purpose of allowing eFUEL's stock to continue being transferred. Each time that Cillo signed and caused these submissions to be transmitted to the OTC Markets Group, he violated the penny stock bar that the SEC had imposed on him in 1995. Moreover, he understood fully what he was doing, and that had he not filed the OTC submissions, Pink Sheets would have imposed a "STOP" designation that would have effectively discouraged the public from trading in eFUEL's penny stock.

Between the 80 or so stock issuance resolutions that Cillo signed, the 50 or so eFUEL press releases that he caused to be issued, and Cillo's signed submissions on eFUEL's behalf to the OTC Markets Group, his conduct was egregious and extensive. It was not isolated in nature, and indeed constituted multiple violations over an extended period of time. As one educated and trained in the law, who had actively practiced law and had immersed himself into securities laws issues, Cillo clearly knew what he was doing and knew that his conduct violated the penny stock bar. Cillo's violations of the penny stock bar were not in any way remote or isolated. Cillo likely thought that enough time had passed since the imposition of the penny stock bar, and that eFUEL was itself small enough, that his conduct on the penny stock company's behalf would fly

under the SEC's enforcement radar. Given his background and his brazen conduct with eFUEL, there is a substantial likelihood that Cillo, if not enjoined, will engage in future illegal conduct. Cillo's conduct is quite recent. Cillo is yet a young man in his 50s and no health reasons would prohibit him from engaging in similar conduct in the future. Cillo should be enjoined from future violations, and ordered to comply with the penny stock bar.

**The Court Should Impose A Statutory Penny Stock Bar Against Cillo**

Cillo is subject to a statutory penny stock bar issued by this Court, based on his violations of Section 15(b)(6)(B)(i) of the Exchange Act [15 U.S.C. § 78o(6)(B)] by violating a prior Commission order against him. As discussed, on June 13, 1995, the Commission had entered an order that "barred [Cillo] from participating in an offering of any penny stock." In the Matter of Joseph P. Cillo, Admin. Proc. File No. 3-8670 (June 13, 1995).

Given the lengthy recidivist nature of Cillo's conduct going back well before the 17 year old order of the Commission, this Court should impose a statutory penny stock bar on Cillo. It clearly has the authority to do so pursuant to Section 21(d)(1) and 21(e) of the Exchange Act, which allows the Commission to seek court orders imposing a statutory penny stock bar pursuant to Section 21(d)(6) and an injunction against future violations of Section 15(b)(6)(B)(i).

In Section 15(b)(6)(C) of the Exchange Act, the term "person participating in an offering of penny stock" specifically includes "any person acting as any promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer, or issuer for purposes of the issuance of any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock." A "penny stock" is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. 240.3a51-1]. Without doubt, the evidence establishes that eFUEL was at all relevant times a penny stock.

Cillo has admitted that the company's stock was a penny stock. A statutory penny stock bar issued by this Court against Cillo, where this Court has the authority to enforce its own judgments, should be imposed against Cillo.

### The Court Should Order Disgorgement with Prejudgment Interest

In Commission enforcement actions, disgorgement prevents violators from being unjustly enriched, and enhances the deterrent effect of such actions by making violations unprofitable.[14] Courts have authority to order defendants to pay prejudgment interest on these ill-gotten gains.[15] Generally, broad discretion is granted to the Court in ordering disgorgement of ill-gotten gains, and also in calculating the amount of those gains. Where disgorgement calculations cannot be exact, 'any risk of uncertainty … should fall on the wrongdoer whose illegal conduct created the uncertainty.'[16]

Upon a finding that the securities laws have been violated, the SEC is "entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains."[17] The disgorged amount must be "causally connected to the violation," but it need not be "figured with exactitude."[18] Where disgorgement calculations cannot be exact, "any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."[19]

In light of Cillo's conduct in this action, disgorgement of the amount he received in the "sale" of his 250 million shares of his stock to EAFN is clearly warranted. Cillo sold his interest

---

[14]    SEC v. Commonwealth Chem. Secs., Inc., 574 F.2d at 102; SEC v. Manor Nursing Ctrs., Inc., 458 F.2d at 1104.

[15]    See, SEC v. Tome, 638 F. Supp. 638 (S.D.N.Y. 1986), aff'd, 833 F.2d 1086 (2d Cir. 1987), cert. denied, 486 U.S. 1014 (1988).

[16]    SEC v. Patel, 61 F.3d 137, 140 (2d Cir.1995); SEC v. Lorin, 76 F.3d 458, 461 (2d Cir.1996).

[17]    SEC v. Calvo, 378 F.3d 1211, 1217 (11th Cir. 2004).

[18]    Id.

[19]    Id.

in eFUEL to EAFN for at least $20,000. [Facts, ¶22-23]. Total gross income, without giving consideration as to whether Cillo paid business expenses, taxes or simply squandered the money has been held to be an appropriate calculation for disgorgement.[20] Cillo should be compelled to disgorge his earnings from the sale of his 250 million shares of his penny stock in eFUEL with prejudgment interest thereon. Prejudgment interest on Cillo's $20,000 for the amount of the sale of his personally held stock in eFUEL, calculated at the IRS rate on unpaid taxes from the date of that sale in March 2011 to date, is $1,178.18. Cillo should be ordered to pay $20,000 in disgorgement and $1,075.96 in prejudgment interest thereon.[21]

## The Court Should Order Cillo To Pay A Civil Penalty

Section 21(d)(3) of the Exchange Act [15 U.S.C §78u(d)(3)] authorizes the SEC to seek civil penalties against any person who has violated the act. Civil penalties are appropriate in this case based upon Cillo's violations and failure to abide by the SEC's penny stock bar. Courts have interpreted the "per violation" language to mean that a penalty can be imposed for every separate violation. SEC v. Coates, 137 F. Supp. 2d 413, 428-30 (S.D.N.Y.)(imposing penalty for each of defendant's four misrepresentations). Applying this rationale, the Commission contends that each violation of the penny stock bar by Cillo (potentially, each of 80 stock issuance resolutions; each of the 50 penny stock company press releases issued under Cillo's control; and each of his acts where Cillo provided information to Pink Sheets relating to eFUEL) justifies a separate Tier One penalty against the recidivist violator Cillo.

---

[20] SEC v. Bocchino, 2002 WL 31528472 (S.D.N.Y. 2002); SEC v. Thomas James Assoc., Inc., 738 F. Supp. 88, 95 (W.D.N.Y. 1990); SEC v. Robinson, 2002 WL 1552049, *8 (S.D.N.Y. 2002).

[21] A Declaration of Nana Jorjoladze, subject to the penalty of perjury, which sets forth the calculation by quarter for prejudgment interest to date, is attached hereto. The SEC will provide a calculation from any other date, or to any other date, that the Court requests.

Section 21(d)(3) of the Exchange Act provides that the SEC may seek to have a court impose one of three tiers of civil penalties. These penalty amounts are typically adjusted to the cost of living. Cillo's conduct herein occurred in 2007, 2008, 2009, 2010 and 2011 after the time the adjustment became effective in early 2001.[22] The amounts of civil monetary penalties applicable herein are, therefore, the amounts for the relevant time of the violation, including the amounts for conduct which occurred after 2/1/2004. First tier penalties for any violation (arising from conduct that as here, occurred after 2/1/2004) may be imposed up to the larger of $6,500 for a natural person or $60,000 for any other person, *or* the amount of ill-gotten gain. When the violation involves fraud, second tier penalties may be imposed up to $60,000 for a natural person or $300,000 for any other person, or the amount of the ill-gotten gain. A third tier civil penalty of up to the larger of $120,000 for a natural person or $600,000 for any other person, or the amount of ill-gotten gain may be imposed when any provision of the Securities Act or the Exchange Act is violated, if the violation involved fraud or deceit and the violation resulted in substantial losses, or created a significant risk of substantial losses, to other persons.

The SEC requests that this Court order Cillo to pay a statutory civil penalty in an amount determined by the Court to be appropriate. Cillo's violations clearly involved a complete disregard for a lawful order of the SEC. Although the value of eFUEL stock is now likely <u>de minimus</u>, the SEC has not alleged that Cillo's conduct resulted in substantial losses to investors. This Court should impose civil penalties against Cillo based upon the *series* of clear and repeated violations of the penny stock bar. Cillo was the central and essential person to the schemes outlined herein, which amounted to violations by him of the penny stock bar. In fact, but for Cillo's leadership at the helm, eFUEL would not have issued these stock issuance resolutions,

---

[22]    17 C.F.R. § 201.1001, Adjustment of Civil Monetary Penalties - 1996. LEXSEE 66 FR 8761 at 8762.

not have issued these press releases and would have been without one authorized to issue periodic reports to the OTC Markets Group. Cillo clearly acted with scienter, and with full knowledge that he was engaging in prohibited conduct. As the CEO of eFUEL, he effectively operated as a promoter and distributor of the company's penny stock. Given the repeated incidents of violations of the penny stock bar by Cillo, a substantial civil penalty is appropriate. A proposed Final Judgment of Permanent Injunction and Other Relief will be provided, if the Court determines it would be of substantial assistance for the Commission to do so.

## V.  CONCLUSION

WHEREFORE, Plaintiff SEC respectfully requests that this Court make findings of fact, enter summary judgment and order injunctive relief, enter an order commanding Cillo to comply with the SEC's penny stock bar against him, order disgorgement of illegal gains with prejudgment interest thereon, impose a statutory penny stock bar or Cillo, and order the recidivist Cillo to pay a substantial civil penalty in this action. The material facts in this case are not in dispute, and there is no reason that this matter should proceed to trial. A final judgment in favor of the Commission is fully appropriate.

Dated:  October 24, 2012          Respectfully submitted,

/s/Edward G. Sullivan
Edward G. Sullivan
Senior Trial Counsel
Florida Bar No. 0473618

COUNSEL FOR PLAINTIFF
Securities and Exchange Commission
950 East Paces Ferry Road, N.E., Suite 900
Atlanta, Georgia 30326
(404)-842-7612
sullivane@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a true and correct copy of SEC'S Dispositive Motion For Summary Judgment Against Defendant Joseph P. Cillo, with Brief in support thereof, with Sworn Testimony of Joseph P. Cillo and exhibits thereto, SEC's First Request for Admissions to Cillo and responses thereto, and Declaration of Nana Jorjoladze upon the defendant by filing it in the court's ECF system, which automatically notifies counsel for the defendant, as follows:

Mark E. Pena, Esq.
334 S. Hyde Park Avenue, Suite 444
Tampa, FL 33606

This 24th day of October, 2012.

/s/Edward G. Sullivan
Edward G. Sullivan

COUNSEL FOR PLAINTIFF

Securities and Exchange Commission
950 East Paces Ferry Road, N.E., Suite 900
Atlanta, Georgia  30326
(404) 842-7612
sullivane@sec.gov